## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIELLE J. SCHIVEK, <br><br> Plaintiff, <br><br> - against - <br><br> AUTHENTIC BRANDS GROUP, LLC, <br><br> Defendant. | Case No. 21 Civ. 1705 <br><br> **COMPLAINT** <br><br> **Jury Trial Demanded** |

Plaintiff Danielle J. Schivek, through her attorneys Kessler Matura P.C., complaining of Defendant Authentic Brands Group, LLC ("ABG" or "the Company"), alleges as follows:

### PRELIMINARY STATEMENT

1. Ms. Schivek joined ABG in October 2017 as in-house legal counsel.

2. ABG entrusted Ms. Schivek with ever increasing levels of responsibility during her employment.

3. On April 30, 2018, Ms. Schivek was promoted to Director of Business Development, a promotion that Corey Salter, ABG's Chief Operating Officer conveyed with an offer of a 15% increase to Ms. Schivek's salary, and an annual bonus increase from 10% of her annual salary to 20% of her annual salary as well as the opportunity to earn commissions on deals that she initiated or worked on. As detailed below, ABG never paid Ms. Schivek this increase in salary nor her earned commissions.

4. Despite Ms. Schivek's excellent job performance and promotion, she was subjected to repeated acts of discrimination and harassment by members of ABG's top leadership team.

5. This conduct included, *inter alia*, discriminatory pay practices, gender-based hostility and harassment, and inappropriate discriminatory comments.

6. ABG retaliated against Ms. Schivek after she complained about the discriminatory treatment and this campaign of retaliation ultimately culminated in her termination.

7. In addition to ABG's unlawful discriminatory and retaliatory behavior, ABG failed to pay Ms. Schivek her earned commissions, unlawfully withholding her earned wages.

## NATURE OF THE CLAIMS

8. Plaintiff seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant's unlawful employment practices in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL"), and New York Labor Law ("NYLL" or "N.Y. Lab. Law") § 190, *et seq*.

## ADMINISTRATIVE PROCEDURES

9. Following the commencement of this action, a copy of this Complaint will be served on both the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

10. Defendant ABG's conduct also violated Title VII. For these violations, Ms. Schivek filed a charge of Discrimination with the EEOC and received a Notice of the Right to Sue from the EEOC on November 30, 2020.

11. Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.

13. The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

14. Venue is proper in this County pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the majority of the unlawful employment practices alleged herein, occurred in this district.

## THE PARTIES

*Plaintiff Danielle J. Schivek*

15. At all times relevant, Ms. Schivek was employed by Defendant.

16. At all times relevant, Ms. Schivek was an "employee" within the meaning of all relevant statutes.

*Defendant ABG*

17. Upon information and belief, Defendant ABG is a brand development company which owns a portfolio of entertainment and lifestyle brands, and a corporation organized under the laws of the State of Delaware, and is authorized to do business pursuant to the laws of the State of New York.

18. Upon information and belief, Defendant ABG maintains offices and operations at 1411 Broadway, New York, New York.

19. At all times relevant, Defendant ABG employs approximately 150 employees.

20. Upon information and belief, Defendant ABG maintains control, oversight, and direction over its operations and employment practices.

21. Defendant ABG's business affects interstate commerce.

22. All times relevant, Defendant ABG was and still is an "employer" within the meaning of all relevant statutes.

## FACTUAL ALLEGATIONS

*Discrimination and Harassment on the Basis of Gender*

23. When Ms. Schivek was promoted to Director of Business Development, the business development team was comprised of approximately twenty-five men. Ms. Schivek was the only woman on the team.

24. The absence of women on the business development team was commented on by Mr. Salter when he promoted Ms. Schivek.

25. Mr. Salter commented that it would be beneficial to have a woman on the team because, "We have Taylor [Morono] out there pitching Frederick's of Hollywood, and he can't sell a woman's lingerie brand, but you [Ms. Schivek] can, you can sell it."

26. Mr. Salter further explained that Ms. Schivek would oversee all of ABG's lifestyle brands except for the sports-oriented brands where women are not the target consumer.

27. Upon offering Ms. Schivek the promotion, Mr. Salter explained that the promotion came with a 15% increase to her current salary, and that her annual bonus would increase from 10% of her annual salary, to 20% of her annual salary.

28. In addition, to an increase in Ms. Schivek's salary and annual bonus, Mr. Salter explained that as a member of the business development team Ms. Schivek would earn commissions on deals that she brought in and/or worked on.

29. Mr. Salter explained that Ms. Schivek would earn 5% commission on new deals and 1% on renewals.

30. Ms. Schivek accepted the promotion.

31. On May 10, 2018, Ms. Schivek was scheduled to lead an important conference call with ABG Senior Vice President and Deputy General Counsel, David Sherman.

32. During this call, Mr. Sherman displayed open hostility.

33. Mr. Sherman pressed the mute button every time that Ms. Schivek attempted to speak. Ms. Schivek was disturbed and upset by this bizarre and unprofessional behavior.

34. This conference call took place in Mr. Sherman's office and he kept the phone extension next to him so that Ms. Schivek could not unmute it and participate in the call. Because of Mr. Sherman's actions, Ms. Schivek was unable to contribute for the entire call that she was slated to lead.

35. The next day, when Ms. Schivek confronted Mr. Sherman about his behavior on the call and objected to being excluded from leading the call or providing any meaningful contribution, Mr. Sherman replied that Ms. Schivek was being "catty."

36. From approximately May 21, 2018, through May 24, 2018, Ms. Schivek attended the 2018 Licensing Expo in Las Vegas with ABG's business development team.

37. For the duration of the 2018 Licensing Expo, Ms. Schivek was excluded from ABG networking dinners and events, including dinners and events with potential ABG business partners. These events and dinners consisted of only male ABG employees.

38. Despite her role as Director of Business Development, Ms. Schivek was only invited to attend events by junior female marketing employees who were in attendance to coordinate for the business development team, and were demeaningly referred to by those on the business development team as, the "marketing girls."

39. At the Licensing Expo, Matthew Salter, Director of Marketing and Partnerships, and son of ABG's Chairman and CEO, Jamie Salter, urged Ms. Schivek to entertain the unwelcome sexual advances of an ABG business associate.

40. Over her objections, the ABG business associate repeatedly touched Ms. Schivek's hair and body, and encouraged her to gamble with his money. Ms. Schivek was very uncomfortable with this behavior, rejected his advances, and walked away. The ABG business associate continued to goad her to gamble with his money. Despite Ms. Schivek's protests, Matthew Salter told her that she should sit down.

41. Ms. Schivek was disgusted by this suggestion and left. This demeaning behavior was witnessed by colleagues.

42. Adam Kronegold, ABG's Chief Digital Officer, was the only ABG employee who acknowledged that the behavior towards Ms. Schivek was sexist and asked if she was OK.

43. After Ms. Schivek complained about the situation to Senior Director Taylor Morono, he responded that what happened to Ms. Schivek was "messed up," but that the business associate was friends with the Salter family so, "What can you do?".

44. On May 22, 2018, Ms. Schivek was running a meeting with a potential ABG partner, PIXSONA, and John Erlandson, ABG's Chief Revenue Officer, put his hand in her face while she was speaking to command her to stop talking.

45. Mr. Erlandson's outrageous behavior was noticed by the potential ABG partner, who made a face and raised her eyebrows at Ms. Schivek.

46. Ms. Schivek was very embarrassed by Mr. Erlandson's treatment and the way that it diminished her reputation and authority.

47. These degrading interactions, along with the fact that Ms. Schivek was the only woman on the business development team and had been excluded from important dinners and networking events all week, set the stage for the increasingly discriminatory atmosphere that developed over the next several months.

48. In July 2018, Mr. Erlandson asked his assistant, Jahayra Munoz, to ascertain whether Ms. Schivek and her male colleague, Morton Abrams were sleeping together, as he had seen them conversing in the office. Ms. Munoz advised Mr. Abrams that Mr. Erlandson had inquired about the nature of Ms. Schivek and Mr. Abrams relationship, and at Mr. Erlandson's direction, advised Mr. Abrams that it was to his benefit to stop communicating with Ms. Schivek.

49. In July of 2018, Mr. Sherman threw a contract at Ms. Schivek and told her to scan it.

50. Mr. Sherman did this in front of several ABG employees, including counsel, Bryan Davidson, who reacted to the incident he witnessed by saying to Ms. Schivek, "I just cringed for you." At ABG, counsel scan their own contracts or request that a support staff member do it. Mr. Sherman never asked a male director to scan his documents, nor did he throw contracts at any male directors.

51. Mr. Sherman directed Ms. Schivek to perform other tasks, such as redlining contracts, which is a task that ABG counsel does for themselves, not something that counsel asks a director to do for them. Mr. Sherman never asked male directors to redline documents for him.

52. In mid-July 2018, Ms. Schivek was running a meeting with an ABG business partner. Mr. Erlandson entered the meeting thirty-five minutes late and mistakenly began to undercut the negotiation already in process with Ms. Schivek by demanding a lower amount of revenue than had already been agreed to by the business partner.

53. Ms. Schivek tried to stop Mr. Erlandson from undercutting the deal and losing ABG money by politely interjecting. Mr. Erlandson put his finger to Ms. Schivek's lips and pressed it against her mouth to prevent Ms. Schivek from talking. Mr. Erlandson then stated, with his finger still on Ms. Schivek's lips, "Danielle, you need to talk less and listen more." This was

shocking and Mr. Erlandson clearly felt entitled to act in this manner because Ms. Schivek is a woman.  Mr. Erlandson would never touch a male director's lips and command them to stop speaking in a meeting.

54. In an early August 2018 meeting, Mr. Erlandson made a "shushing" motion to Ms. Schivek, as if speaking to a child. There were approximately ten people in the room, including ABG business partners.  This was very humiliating for Ms. Schivek.

55. Naushaba Moeen, Vice President of Brand was in attendance at this August 2018 meeting.  After this meeting Ms. Moeen warned Ms. Schivek that the "Frat Pack" was "coming for" her.  Ms. Moeen told Ms. Schivek that that this sexist treatment is common in the industry and that she shouldn't take it personally.

56.  Frat Pack is the nickname that ABG employees used to refer to the Business Development team.

57. Ms. Schivek performed very well at ABG and exceeded her total deal value (TDV) target by over 600% and accumulated significant commissions on the correlating deals.

58. On July 13, 2018, Ms. Schivek attended a meeting with Mr. Morono, Mr. Erlandson and Jovana Granzan, Senior Vice President of Operations and acting Human Resources Manager.

59. At the July 13, 2018 meeting, Mr. Erlandson asked Ms. Schivek, "How do you think that you are doing at your job?" Ms. Schivek responded, "If we are going by the numbers, then I am doing great." Erlandson then said, "What about in general?"

60. Ms. Schivek found Mr. Erlandson's desire to avoid evaluating her in terms of numbers surprising because the business development team is solely evaluated on the revenue generated for ABG.

61.     Ms. Schivek replied to Mr. Erlandson's question about how she was doing "in general" by listing recent accomplishments and positive feedback she had received from senior staff and ABG's business partners.

62.     Mr. Erlandson responded, "You have a warped sense of reality. Numbers aside, no one here likes you."

63.     Mr. Erlandson said that in all meetings going forward, Ms. Schivek should remember to "speak less, and listen more."

64.     Ms. Schivek responded that she had received very positive feedback from ABG's senior staff and business partners and that it was reflected by the fact that she was already hitting the revenue target set for her by Mr. Erlandson and Mr. Salter.

65.     At this point, Ms. Schivek raised the fact that she still had not received the increase in salary that she was offered when she accepted the promotion to Director of Business Development.

66.     Mr. Erlandson responded, "Let's not turn this into a game of 'he said, she said.'"

67.     Ms. Schivek pointed out that the men promoted on the business development team had received their raises immediately and that she should be treated the same as her male counterparts.  Ms. Schivek also stated that she was aware that the male directors made significantly more than her for doing similar work.

*Retaliation after Ms. Schivek's Complaint about Sex Discrimination*

68.     After the July 13, 2018 meeting with Mr. Morono, Mr. Erlandson, and Ms. Granzan, Ms. Granzan and Ms. Schivek had a meeting.

69.      Ms. Schivek asked Ms. Granzan for clarity concerning her pay and the reporting structure.

70. Ms. Granzan asked if Ms. Schivek was OK, and Ms. Schivek told her that she was not OK, that it was very hard to be a woman at ABG, and that she had never felt more humiliated and demoralized in her entire life.

71. Ms. Schivek described how she was being treated worse than the men on the business development team because she is a woman.

72. Ms. Schivek told Ms. Granzan about the discriminatory treatment that she had been subjected to, including the incidents described *inter alia* with Mr. Erlandson, Mr. Morono, and Mr. Sherman.

73. Ms. Schivek also relayed to Ms. Granzan that ABG was discriminating against her by refusing to process her pay raise, and complained about how that this extreme delay does not happen to men at ABG.

74. Immediately after Ms. Schivek's complaint of sex discrimination to Ms. Granzan, many of the deals that Ms. Schivek had been working on for months were reassigned to men, who in turn received a commission on the work that she had performed.

75. On July 17, 2018, Mr. Morono asked Ms. Schivek to draft commercial terms for a license for ABG's Adrienne Vittadini brand. This request was unusual because Ms. Schivek did not have a relationship to the deal up until that request.

76. Later that day, Mr. Erlandson began to copy Mr. Morono on all emails between Mr. Erlandson and Ms. Schivek. Mr. Erlandson then directed Ms. Schivek to take all future meetings with Mr. Morono instead of with him. All of Ms. Schivek's male colleagues on the business development team, even those significantly more junior than Ms. Schivek, such as newly hired managers still reported directly to Mr. Erlandson.

77. After approximately July 17, 2018, Mr. Morono and Mr. Erlandson began to explicitly treat Ms. Schivek as their personal assistant, directing her to schedule meetings for them, meetings where she would not be in attendance.

78. Prior to her complaints of gender discrimination, Ms. Schivek would only schedule meetings that she would also be attending. Scheduling meetings for directors and more senior staff is the job of ABG's executive assistants, not directors.

79. None of ABG's male directors are required to perform administrative tasks such as scheduling meetings that they will not be attending.

80. After Ms. Schivek complained about Mr. Sherman's discriminatory behavior to Ms. Granzan, Mr. Sherman requested that Mr. Erlandson remove Ms. Schivek from weekly business and legal priority meetings, meetings which Ms. Schivek had initiated and had been leading for months.

81. Mr. Erlandson told Ms. Schivek that Mr. Sherman said that Ms. Schivek was a "distraction."

82. Mr. Erlandson replaced Ms. Schivek at these meetings with Mr. Morono.

83. On approximately July 26, 2018, Mr. Erlandson mocked Ms. Schivek by repeating all the gender discrimination complaints that Ms. Schivek made to Ms. Granzan on July 17, 2018. Mr. Erlandson dismissed Ms. Schivek's complaints of sex discrimination by belittling her for raising them.

84. Ms. Granzan was present at the July 26, 2018, meeting but remained silent as Mr. Erlandson berated Ms. Schivek about her sex discrimination complaints.

85. When Ms. Schivek asked why she was being treated differently than her male colleagues, Mr. Erlandson did not respond to her direct question and instead stated, "I think you resent the fact you're no longer reporting to me."

86. In early August 2018, Ms. Schivek was working late and overheard Mr. Erlandson speaking about her on the phone to Ron Zofnat, Vice President, International Business Development, saying that "she doesn't know how it works around here," and telling Mr. Zofnat "we've got to put her in her place." Ms. Schivek stood up so that Mr. Erlandson could see that she was still at the office and they made eye contact and he then shut his door.

87. On August 10, 2018, ABG terminated Ms. Schivek.

*Unpaid Wages*

88. When Mr. Salter promoted Ms. Schivek to Director of Business Development, he explained that she would be earning 5% commission on new deals and 1% on renewal deals.

89. After her promotion to Director of Business Development, Ms. Schivek received weekly "report card" outlining commissions earned and goals met.

90. ABG has a record of all Ms. Schivek's weekly report cards, which detail commissioned owed.

91. These report cards were emailed weekly by Business Development Analyst Jeevan Kesavan, Mr. Salter and Mr. Erlandson.

92. After Ms. Schivek's complaints of gender discrimination, ABG began to decrease the amounts of commissions owed to Ms. Schivek on the report cards by assigning her ongoing deals to others.

93. Ms. Schivek's penultimate Report Card excluded a number of deals that she had been working on.

94. Ms. Schivek reached out to Mr. Kesavan, who was tasked with compiling the commissions data.

95. Ms. Schivek notified Mr. Kesavan that a number of deals she had been working on were not included on her report cards.

96. Mr. Kesavan stated that he would make sure that the excluded deals would be included on her next report card, including the respective commission.

97. However, on the next report card Ms. Schivek discovered that Mr. Kesavan allocated percentages of several of her deals to male members of the business development team. Moreover, Mr. Kesavan allocated a sizable percentage of the Sunrise Brands for Herve Leger deal to Mr. Salter.

98. The allocation to Mr. Salter was particularly shocking because when Ms. Schivek was offered the promotion to Director of Business Development by Mr. Salter, he explained how the business development team would earn commissions, and emphasized that the team could draw on Mr. Salter or Mr. Erlandson for support should they need it as this would never affect commissions. Moreover, Mr. Salter assigned Ms. Schivek the Sunrise Brands deal via email stating "This is yours now."

99. At the majority of business development team meetings commissions were discussed, and the team was constantly reminded that working with Corey Salter or Mr. Erlandson would not affect commissions.

100. When Ms. Schivek confronted Mr. Kesavan about the misallocation of her commissions, Mr. Kesavan stated that Corey Salter directed him to allocate her commissions in this manner.

101. ABG never paid Ms. Schivek the commissions that she earned while Director of Business Development.

## FIRST CAUSE OF ACTION
### (Retaliation a Title VII Violation)

102. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

103. Defendant ABG engaged in unlawful employment practices in violation of Title VII by subjecting Plaintiff to materially adverse changes to the condition of her employment in retaliation for engaging in protected activity – i.e., opposing unlawful harassment because of sex.

104. Plaintiff engaged in protected activity by reporting and complaining about discrimination and harassment on the basis of sex.

105. Defendant ABG knew that Plaintiff engaged in the protected activity of reporting and complaining about discrimination and harassment on the basis of sex.

106. Plaintiff suffered a materially adverse change to her employment as described herein.

107. There is a direct causal connection between Plaintiff's protected activity and Defendant ABG's adverse actions.

108. Defendant ABG deprived Plaintiff of equal employment opportunities and otherwise adversely affected her status as an employee because of her opposition to unlawful sex discrimination.

109. Plaintiff is now suffering, will continue to suffer irreparable injury and monetary damages as a consequence of Defendant ABG's retaliatory and adverse acts.

110. Defendant ABG acted intentionally and with malice and/or reckless indifference to Plaintiff's statutory rights.

## SECOND CAUSE OF ACTION
### (Gender Discrimination in Violation of the NYSHRL)

111. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

112. Defendant discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender, including, *inter alia,* discriminatory pay, failures to promote, termination and/or a hostile work environment.

113. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

114. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)

115. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

116. Defendant retaliated against Plaintiff on the basis of her protected activity in violation of the NYSHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia,* failures to promote and/or termination.

117. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

118. As a direct and proximate result of Defendant's unlawful retaliatory conduct in

violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION
### (Gender Discrimination in Violation of the NYCHRL)

119. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

120. Defendant discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender, including, *inter alia,* discriminatory pay, failures to promote, termination and/or a hostile work environment.

121. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

122. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

123. Defendant's unlawful discriminatory was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)

124. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

125. Defendant retaliated against Plaintiff on the basis of her protected activity in violation of the NYCHRL by subjecting Plaintiff to adverse actions because she engaged in

protected activity, including, *inter alia,* failures to promote and/or termination.

126. As a direct and proximate result of Defendant's unlawful retaliatory conduct and in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

127. As a direct and proximate result of Defendant's unlawful retaliatory conduct and in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

128. Defendant's unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Unpaid Earned Commissions a NYLL Violation)

129. Plaintiff realleges and incorporates all allegations in all preceding paragraphs.

130. NYLL § 193 prohibits an employer from deducting from an employee's wages, except in limited circumstances.

131. The unpaid commission is a wage as defined by NYLL § 190(1).

132. Plaintiff earned the commission for the year 2018.

133. Defendant violated NYLL § 193 by failing to pay Plaintiff earned commissions.

134. Defendant's violation of NYLL § 193 was willful.

135. Due to Defendant's NYLL violations, Plaintiff is entitled to recover from Defendant her earned wages, commissions, liquidated damages, reasonable attorneys' fees, and costs of this action, all in an amount to be determined by this Court.

**JURY DEMAND**

136. Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York and the City of New York;

B. An injunction and order permanently restraining Defendant and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C. An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D. An award of Plaintiff's unpaid back wages and liquidated damages equal to the unpaid back wages pursuant to the NYLL;

E. An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

F. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial;

G. An award of punitive damages and any applicable penalties and/or liquidated damages, in an amount to be determined at trial;

H. Prejudgment interest on all amounts due;

I. An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

J. Such other and further relief as the Court may deem just and proper.

Dated: Melville, New York
February 25, 2021

Respectfully submitted,

By: /s/ *Tana Forrester*
Tana Forrester

**KESSLER MATURA P.C.**
Troy L. Kessler
Tana Forrester
534 Broadhollow Road, Suite 275
Melville, New York 11747
(631) 499-9100
tkessler@kesslermatura.com
tforrester@kesslermatura.com

*Attorneys for Plaintiff*